**IN THE UNITED STATES DISTRICT COURT**
**FOR THE DISTRICT OF DELAWARE**

STACIE T. BURTON,

Plaintiff,

v.

STATE OF DELAWARE DEPARTMENT OF HEALTH AND SOCIAL SERVICES DIVISION OF SOCIAL SERVICES,

Defendant.

Civil Action No. 24-892-RGA

MEMORANDUM OPINION

Gary E. Junge, William D. Fletcher, Jr., SCHMITTINGER & RODRIGUEZ, P.A., Dover, DE,

Attorneys for Plaintiff.

Sehr Rana, DEPARTMENT OF JUSTICE, Wilmington, DE,

Attorney for Defendant.

November 24, 2026

**ANDREWS, U.S. DISTRICT JUDGE:**

Before me is Defendant State of Delaware Department of Health and Social Services Division of Social Services' motion for summary judgment. (D.I. 53). I have reviewed the briefing for this motion. (D.I. 54, 55, 59). I heard oral argument on September 25, 2026. For the reasons set forth below, Defendant's motion is GRANTED.

## I. BACKGROUND

Plaintiff has held state government jobs for the Office of the Governor since 2016. From 2016 to 2018, Plaintiff worked as a Staff Assistant, and starting in 2018, she worked as the Community Liaison and the Keep Delaware Litter Free Coordinator. (D.I. 56 at A001). On December 30, 2021, Plaintiff was appointed to another state job with the Group Violence Intervention ("GVI") program, which was a part of Defendant's organization. (D.I. 54-1 at 43 of 308). Plaintiff's position in GVI was in an "exempt"[1] capacity in administrative management. (*Id.*). Her employment began on January 2, 2022, and Christine Cressler ("Cressler"), the Deputy Director of Support and Outreach for GVI, was her supervisor. (*Id.* at 43, 200, 202 of 308). All relevant events occurred during the next nine months.

On January 3, Plaintiff's first day of work at GVI, Plaintiff requested to work from home because she had been exposed to Covid. (*Id.* at 300 of 308). Plaintiff took sick time until January 7, 2022. (*Id.*). On January 9, Plaintiff reported that she had tested negative for Covid but was experiencing symptoms. (*Id.*). As a result, she agreed to take more sick time and stayed out for her second week of employment at GVI. (*Id.*). On January 18, Plaintiff submitted a COVID-19

---

[1] "Exempt" employees are at-will employees. (D.I. 54-1 at 104 of 308 (deposition transcript at 57:17–19); D.I. 54-4 at 57 of 264 (deposition transcript at 15:8–9)). Plaintiff's status as an at-will employee is not relevant to the claims brought in this case.

Federal Emergency Paid Sick Leave form requesting paid sick leave from January 4 to January 14. (D.I. 56 at A048).

On January 24, Cressler emailed Plaintiff in response to Plaintiff expressing concern that her sleep apnea might affect her ability to do her job. (D.I. 54-1 at 300, 307 of 308). The email stated that no accommodations were requested when Plaintiff was hired and directed Plaintiff to let Cressler know if Plaintiff requested an accommodation. (*Id.* at 307 of 308). The email stated that telecommuting was not discussed during Plaintiff's interview process, but that limited work from home could be permitted after Plaintiff had completed her training. (*Id.*). On January 25, Plaintiff and Cressler had a conference call with Jaye Washington, Defendant's Community Engagement Administrator and Plaintiff's task supervisor. (D.I. 54 at 226, 229 of 308 (deposition transcript at 10:9–12, 13:2–5); D.I. 56 at A054–101). During the call, Cressler stated that Defendant and GVI require staff to have performance plans and that February 4 would be the target date for Plaintiff's performance plan. (D.I. 56 at A086:9–A087:24). A performance plan was never implemented.

On February 10, Plaintiff tested positive for Covid, and on February 16, she received a note from the care center stating that Plaintiff could return to work on February 21. (*Id.* at A103–04). After visiting the care center again on February 19, Plaintiff received another note stating that she could return to work on February 23. (*Id.* at A111). On February 17, Plaintiff submitted a second Federal Emergency Paid Sick Leave form requesting paid sick leave from February 7 to February 23. (*Id.* at A108–10).

On February 6, Plaintiff submitted an Americans with Disabilities Act ("ADA") Accommodation Request form requesting to work from home at least three days per week, citing "long term Covid syndrome" as her disability. (*Id.* at A105–07). On February 24, Cameron

Corbett ("Corbett"), an Employee Relations Regulatory Specialist, notified Cressler of Plaintiff's request. (*Id.* at A112; D.I. 57 at A304). Corbett told Cressler that she would be facilitating the ADA-required "interactive process", a conversation between the employee and employer to determine if the employee needs an accommodation. (*Id.* at A112).

As part of the interactive process, Plaintiff had a phone call with Cressler and Corbett on March 7. (*See id.* at A115–43). During the call, Cressler expressed dissatisfaction with Plaintiff's attendance at work. (*Id.* at A125, A127, A129, A137, A138–39 (transcript at 10:7–10, 12:1–12, 14:12–15, 22:1–6, 23:18–24:3)). Cressler and Plaintiff interrupted each other multiple times, and Plaintiff stated she was "bothered" by Cressler describing Plaintiff's attendance as an "issue." (*Id.* at A127, A129 (transcript at 12:6–21, 14:16–21)). At one point during the call, Plaintiff told Cressler, "You're not willing to work with me, and that's unfortunate." (*Id.* at A138–39 (transcript at 23:22–24:3)). Cressler stated that Plaintiff's work product was insufficient, and Cressler and Plaintiff argued about whether this was true. (*Id.* at A140–41 (transcript at 25:11–26:14)). Following this dispute, Corbett ended the call. (A142 (transcript at 27:1–14)).

On March 9, there was a follow-up meeting attended by Cressler, Corbett, Jaye Thompson ("Thompson"), Defendant's Community Engagement Administrator, and Susanne Laliberte ("Laliberte"), Defendant's ADA Coordinator. (*See* D.I. 54-1 at 229 of 398 (deposition transcript at 13:4–5; D.I. 54-2 at 65–93, 99–137 of 288)). During this call, Cressler stated that she did not understand why Plaintiff would need an accommodation to work remotely if she was capable of attending community events in person. (D.I. 56 at A149 (transcript at 17–21)). Cressler reiterated her concerns about Plaintiff's attendance and work performance and stated that Plaintiff needed supervision. (*Id.* at A152, A159 (transcript at 8:13–14, 15:4)). Plaintiff and Cressler again interrupted and argued with each other. (*Id.* at A159–62 (transcript at 15:14–18:10)). Based on

Plaintiff's work responsibilities and health situation, Laliberte stated that she would approve two days of telework per week. (*Id.* at A169 (transcript at 25:14–21)).

On March 16, Plaintiff received written permission to work from home two days per week. (D.I. 54-2 at 215 of 288). Cressler notified Plaintiff that she would have to submit activity logs to document the work she performed while working from home. (*Id.* at 217 of 288). Cressler and Washington maintained a Task Status document to track Plaintiff's work. (D.I. 54-3 at 4–10 of 154). Of the fourteen tasks listed in the document, eight were labeled as completed late or not at all and four were labeled as initially being below expectations or of unacceptable quality. (*Id.*). Cressler drafted a letter dated April 4 that would impose a five-day suspension on Plaintiff for failure to maintain reliable attendance and to follow the State's Standards of Conduct Policy and Procedures. (*Id.* at 26–28 of 154). The letter was never delivered, and the suspension was never imposed.

On April 6, during a follow-up ADA meeting with Laliberte, Plaintiff stated that she felt emotional following the ADA interactive process meetings on March 7 and March 9. (D.I. 54-4 at 8 of 264). As a result, Laliberte and Corbett sent Plaintiff the Respectful Workplace and Anti-Discrimination ("RWAD") complaint form to give her an opportunity to address her complaints. (*Id.*). On the same day, Plaintiff filed an RWAD complaint against Cressler, alleging discrimination, harassment, a hostile work environment, and retaliation, and included Cressler's comments about Plaintiff during the ADA meetings. (*Id.* at 4–6 of 264). In response to the complaint, Corbett initiated an investigation starting April 6. (*Id.* at 8 of 264). On April 13, 2022, Cressler scheduled weekly one-on-one meetings with Plaintiff. (D.I. 54-3 at 37 of 154).

On May 9, Plaintiff submitted an updated accommodation request, seeking a five-day telework schedule. (D.I. 57 at A214). Plaintiff met with Cressler and Laliberte to discuss the

requests, and Cressler remarked at the meeting that Plaintiff's training was still incomplete. (*Id.* at A234:5–A244:7). On May 11, more of Plaintiff's requested accommodations were approved, including permission to wear comfortable clothes and shoes, an extra chair, a desk riser, and a later start to Plaintiff's workday. (*Id.* at A215–A216). On June 1, Plaintiff emailed Laliberte to ask about whether she could use the State's Alternative Work Arrangement ("AWA") policy to increase her number of work-from-home days. (*Id.* at A215).

On August 2, Plaintiff was suspended for five days for failing to comply with the State's Standards of Conduct Policy and Procedures. (D.I. 54-4 at 19–21 of 264). The suspension letter stated that Plaintiff had violated the Code of Conduct by shouting at and interrupting Cressler in meetings, hanging up on Cressler during "supervisory sessions," and refusing to properly account for time worked, among other violations. (*Id.* at 19 of 264). On the same day the suspension was issued, Plaintiff asked how to dispute it. (D.I. 57 at A291–94). On August 8, Corbett completed his RWAD complaint investigation and found Plaintiff's claims to be mostly unsubstantiated. (D.I. 54-4 at 8–17 of 264). The investigation report concluded that Plaintiff and Cressler "have both made an uncomfortable or hostile work environment for each other." (*Id.* at 11 of 264). The report recommended that Cressler receive coaching and training and that Plaintiff receive a five-day suspension and a demotion. (*Id.* at 17 of 264).

On September 8, September 15, and September 22, Plaintiff brought her husband to GVI outreach events and a call-in event, which are closed to the public. (D.I. 54-1 at 131–141 of 308 (deposition transcript at 84:18–94:7); D.I. 54-4 at 39 of 264). On October 6, Plaintiff was terminated from her position at GVI. (D.I. 57 at A339–41). Molly Magarik, Secretary of Delaware Health and Social Services, made the termination decision. (D.I. 54-1 at 259 of 308 (deposition transcript at 43:9–11); D.I. 57 at A341, A687 (deposition transcript at 30:3–6)). Secretary Magarik

received information about the basis for Plaintiff's termination, but she was not made aware of Plaintiff's ADA accommodations or RWAD complaint against Cressler. (D.I. 57 at A687–89, A698 (deposition transcript at 30:7–34:18, 41:20–21)). At some point after her termination, Plaintiff returned to work for the Office of the Governor. (*Id.* at A781).

On October 2, 2024, Plaintiff filed an Amended Complaint, alleging claims of disability and race discrimination and retaliation against Defendant and Cressler. (*See generally* D.I. 6). Cressler and Defendant filed a partial motion to dismiss (D.I. 11), and the parties stipulated that Cressler and Defendant would withdraw the motion and Plaintiff would file an amended complaint (D.I. 14). I granted the stipulation. (*See* D.I. 15). On February 21, 2025, Plaintiff filed the Second Amended Complaint, removing Cressler as a defendant and alleging disability discrimination and retaliation under Section 504. (*See generally* D.I. 16).

## II. LEGAL STANDARD

"The court shall grant summary judgment if the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." FED. R. CIV. P. 56(a). The moving party has the initial burden of proving the absence of a genuinely disputed material fact relative to the claims in question. *Celotex Corp. v. Catrett*, 477 U.S. 317, 330 (1986). Material facts are those "that could affect the outcome" of the proceeding. *Lamont v. New Jersey*, 637 F.3d 177, 181 (3d Cir. 2011) (quoting *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248 (1986)). "[A] dispute about a material fact is 'genuine' if the evidence is sufficient to permit a reasonable jury to return a verdict for the non-moving party." *Id.* The burden on the moving party may be discharged by pointing out to the district court that there is an absence of evidence supporting the non-moving party's case. *Celotex*, 477 U.S. at 323.

The burden then shifts to the non-movant to demonstrate the existence of a genuine issue for trial. *Matsushita Elec. Indus. Co. v. Zenith Radio Corp.*, 475 U.S. 574, 586–87 (1986); *Williams v. Borough of West Chester*, 891 F.2d 458, 460–61 (3d Cir. 1989). A non-moving party asserting that a fact is genuinely disputed must support such an assertion by: "(A) citing to particular parts of materials in the record, including depositions, documents, electronically stored information, affidavits or declarations, stipulations . . . , admissions, interrogatory answers, or other materials; or (B) showing that the materials cited [by the opposing party] do not establish the absence . . . of a genuine dispute . . . ." FED. R. CIV. P. 56(c)(1). The non-moving party's evidence "must amount to more than a scintilla, but may amount to less (in the evaluation of the court) than a preponderance." *Williams*, 891 F.2d at 460–61.

When determining whether a genuine issue of material fact exists, the court must view the evidence in the light most favorable to the non-moving party and draw all reasonable inferences in that party's favor. *Scott v. Harris*, 550 U.S. 372, 380 (2007); *Wishkin v. Potter*, 476 F.3d 180, 184 (3d Cir. 2007). If the non-moving party fails to make a sufficient showing on an essential element of its case with respect to which it has the burden of proof, the moving party is entitled to judgment as a matter of law. *See Celotex Corp.*, 477 U.S. at 322.

## III. DISCUSSION

Defendant moves for summary judgment on Plaintiff's claims of disability discrimination and retaliation under Section 504. (D.I. 53).

The *McDonnell Douglas* burden-shifting framework governs employment discrimination and retaliation claims under the Rehabilitation Act. *Wishkin v. Potter*, 476 F.3d 180, 185 (3d Cir. 2007); *Boandl v. Geithner*, 752 F.Supp.2d 540, 561 (E.D. Pa. 2010). Under the *McDonnell Douglas* framework, the plaintiff must establish a prima facie case of the complained-of

discrimination. *McDonnell Douglas Corp. v. Green*, 411 U.S. 792, 802 (1973). If the plaintiff establishes a prima facie case, then the burden shifts to the defendant to provide a legitimate nondiscriminatory reason for the alleged adverse employment action. *McDonnell Douglas Corp.*, 411 U.S. at 801–03.

If the defendant provides a legitimate nondiscriminatory reason, then the burden shifts back to the plaintiff to demonstrate that the defendant's articulated reason is pretext. *Id.* at 804. "[T]o avoid summary judgment, the plaintiff's evidence rebutting the employer's proffered legitimate reasons must allow a factfinder reasonably to infer that *each* of the employer's proffered non-discriminatory reasons was either a *post hoc* fabrication or otherwise did not actually motivate the employment action." *Fuentes v. Perskie*, 32 F.3d 759, 764 (3d Cir. 1994) (cleaned up). "[T]he plaintiff must point to some evidence, direct or circumstantial, from which a factfinder could reasonably either (1) disbelieve the employer's articulated reasons; or (2) believe that an invidious discriminatory reason was more likely than not a motivating or determinative cause of the employer's action." *Fuentes*, 32 F.3d at 764.

**A. Discrimination**

The Third Circuit has held, "To establish a prima facie case of discrimination under the Rehabilitation Act, a plaintiff must initially show, '(1) that he or she has a disability; (2) that he or she is otherwise qualified to perform the essential functions of the job, with or without reasonable accommodations by the employer; and (3) that he or she was nonetheless terminated or otherwise prevented from performing the job.'" *Wishkin*, 476 F.3d at 184–85. Discrimination claims under the Rehabilitation Act, unlike most discrimination claims, require a plaintiff to

demonstrate that her disability was the sole cause of her termination.[2] *CG v. Pennsylvania Dept. of Educ.*, 734 F.3d 229, 235–36 (3d Cir. 2013).

Plaintiff alleges that Defendant discriminated against her by denying Plaintiff a reasonable accommodation and by subjecting Plaintiff to restricted opportunities, disparate treatment, harassment, and a hostile work environment because of her disability or requests for accommodation. (D.I. 16 ¶¶ 53–54). The decisionmaker responsible for terminating Plaintiff's employment, Secretary Magarik, was not aware of Plaintiff's ADA accommodations or requests. Plaintiff nevertheless argues that Cressler's "discriminatory animus" toward Plaintiff tainted Secretary Magarik's decision-making process and renders Defendant liable for discrimination. (D.I. 71 at 1–2). In response, Defendant argues that it is entitled to summary judgment on Plaintiff's discrimination claim because it terminated Plaintiff for a legitimate, nondiscriminatory reason and Plaintiff cannot show that the reason for her termination was pretextual. (D.I. 54 at 13–18).

I agree with Defendant. Defendant has provided a legitimate, nondiscriminatory reason for Plaintiff's termination, and Plaintiff has failed to demonstrate that this reason is pretextual.

The legitimate, non-discriminatory reason is poor work performance. While working at GVI, Plaintiff missed deadlines and submitted work of substandard quality on multiple occasions, as documented in the Task Status document maintained by Cressler and Washington and the undelivered suspension letter drafted in April. (D.I. 54-3 at 4–10, 26–32 of 154; D.I. 54-1 at 127 of 308 (deposition transcript at 80:1–16)). Plaintiff was suspended for five days in August. Plaintiff violated the State of Delaware's Standards of Conduct policy by bringing her husband to outreach events and bringing her husband and a friend to a call-in event, which is

---

[2] Plaintiff agrees that she must show her disability was the sole cause. (D.I. 55 at 11 n.2).

closed to the public. (D.I. 54-4 at 39–41 of 264). Plaintiff was unprofessional toward Cressler on multiple occasions. (*Id.* at 2, 19–21, 31 of 264). Plaintiff's workplace behavior thus shows that Secretary Magarik had legitimate, nondiscriminatory reasons for terminating Plaintiff based on her work performance.

Plaintiff contends that Defendant's reasons for her termination are pretextual because she never completed her training and Defendant never placed Plaintiff on a performance improvement plan ("PIP"). (D.I. 55 at 16–17). Yet, an employer can lawfully terminate an employee for failing to meet the employer's expectations, and there is no legal requirement that an employer place an employee on a PIP before terminating the employee. *See Mitchell v. UBS Services USA LLC*, 2009 WL 1856630 at *13 (D.N.J. June 26, 2009) (stating "[Plaintiff's] failure to meet [their employer's] subjective expectations before being placed on the PIP permitted the company to terminate [Plaintiff's] employment at that time, and the Court knows of no requirement for placing an employee on an improvement program before termination becomes lawful"); *McBryde v. Continental Airlines, Inc.*, 2009 WL 3242133 at *2 (D.N.J. Oct. 6, 2009)). Thus, Plaintiff's incomplete training and the lack of a PIP do not make Defendant's reasons for terminating Plaintiff pretextual.

Plaintiff further argues Defendant could not have terminated her solely due to poor work performance because there was no documentation of the issues listed in her termination letter prior to her termination. (D.I. 55 at 16–17). However, even though the issues of Plaintiff bringing her husband to outreach and call-in events were not documented before the termination letter, Plaintiff's poor work performance had been documented in Cressler's and Washington's Task Status document, the undelivered suspension letter drafted in April, and the August suspension letter. (D.I. 54-3 at 4–10, 26–32 of 154; D.I. 54-4 at 19–21 of 264). Further, the

issues in the termination letter all took place in September 2022, the month immediately before Plaintiff's termination on October 6, 2022. (D.I. 54-4 at 39–41 of 264).

Plaintiff also emphasizes that Javar Simpson, the Deputy Director of GVI, stated in his deposition that he would not have terminated Plaintiff based on the infractions listed in her termination letter and argues that Simpson's statement proves that Defendant's reasons for terminating her were pretextual. (D.I. 55 at 17–18). However, Simpson did not appear to be aware that Plaintiff violated the State of Delaware's Standards of Conduct policy. (D.I. 57 at A384:16–21). Further, based on Plaintiff's missed deadlines, substandard work product, and unprofessionalism, Defendant had sufficient reasons for terminating Plaintiff based on her work performance, regardless of Simpson's statement.[3] *See Mitchell*, 2009 WL 1856630 at *13. Thus, Plaintiff has failed to provide evidence that would "allow a factfinder reasonably to infer that . . . the employer's proffered non-discriminatory reason[] was either a *post hoc* fabrication or otherwise did not actually motivate the employment action." *Fuentes*, 32 F.3d at 764.

Plaintiff concedes that there is no evidence that the decision-maker, Secretary Magarik, personally had any discriminatory animus in making the termination decision. Although undeveloped in the briefing, Plaintiff now relies upon the cat's paw theory of liability. (D.I. 71). Under that theory of liability, the Third Circuit has held that an employer is liable for discrimination under Title VII "when an employee's 'supervisor performs an act motivated by [discriminatory] animus that is *intended* by the supervisor to cause an adverse employment action, and . . . is a proximate cause of the ultimate employment action.'" *Jones v. Southeastern Pa. Trans. Authority*, 796 F.3d 323, 330 (3d Cir. 2015) (citing *Staub v. Proctor Hosp.*, 562 U.S.

---

[3] A difference of opinion among supervisors as to the appropriate level of discipline does not raise the inference that those who support greater discipline are doing so for the wrong reasons.

411, 422 (2011)). The Third Circuit has not addressed whether cat's paw liability can apply to discrimination claims under the Rehabilitation Act. There is a good reason to treat claims of discrimination in the two contexts differently. The cat's paw liability cannot apply to discrimination claims under the Rehabilitation Act because such claims require sole causation. An employee's termination in a cat's paw situation is caused by both a supervisor's discriminatory animus and a decisionmaker's independent choice to terminate the employee. *See Harmon v. Collier*, 158 F.4th 595, 617 (5th Cir. 2025). That is the situation here. I hold that the cat's paw theory cannot apply to Plaintiff's Rehabilitation Act claim.

Even if cat's paw liability were to apply to discrimination claims under the Rehabilitation Act, it would not apply here because Cressler was not Plaintiff's supervisor. The Supreme Court has held that "an employee is a 'supervisor' for purposes of vicarious liability if he or she is empowered by the employer to take tangible employment actions against the victim," such as "hiring, firing, failing to promote, reassignment with significantly different responsibilities, or a decision causing a significant change in benefits." *Vance v. Ball State University*, 570 U.S. 421, 424, 429 (2013). Here, while Cressler took part in conversations regarding Plaintiff's requests for ADA accommodations, Cressler did not decide whether Plaintiff's requests would be granted. (D.I. 54-2 at 215 of 288). This decision was made by ADA Coordinator Laliberte through an "interactive" and "cooperative process" facilitated by Corbett. (*Id.* at 63, 124, 215 of 288 (transcript at 25:14–21). Moreover, Cressler could only make recommendations regarding discipline, and "leadership and HR," not Cressler, decided on and imposed discipline. (D.I. 54-1 at 106–07 (deposition transcript at 59:23–60:3)). Thus, Cressler was not "empowered by the employer to take tangible employment actions" against Plaintiff such as "hiring, firing, failing to

promote, reassignment . . . or a decision causing a significant change in benefits," and Cressler was not Plaintiff's supervisor for purposes of vicarious liability. *Vance*, 570 U.S. at 424, 429.

Viewing the evidence in the light most favorable to Plaintiff, there is not sufficient evidence from which a jury could conclude that Plaintiff has shown that Defendant's legitimate, nondiscriminatory reason for terminating Plaintiff's employment is pretextual. Thus, Plaintiff has failed to carry her burden under the *McDonnell Douglas* framework, and Defendant is entitled to judgment as a matter of law on the discrimination claim.

**B. Retaliation**

"To establish a prima facie case of retaliation under the Rehabilitation Act, a plaintiff must show: (1) protected employee activity; (2) adverse action by the employer either after or contemporaneous with the employee's protected activity; and (3) a causal connection between the employee's protected activity and the employer's adverse action." *Boandl*, 752 F.Supp.2d at 561. The parties agree that to succeed on a retaliation claim under the Rehabilitation Act, Plaintiff must show that Defendant would not have terminated her but for her engagement in protected activity. (D.I. 70 at 1–2).

Plaintiff alleges that Defendant retaliated against her by coercing, intimidating, or threatening her in response to her filing a RWAD complaint about the failure to grant her requested accommodation and Defendant's disability discrimination. (D.I. 16 ¶¶ 59–68; D.I. 55 at 18–20).[4] In response, Defendant contends that it is entitled to summary judgment because there is no evidence that it terminated Plaintiff in response to Plaintiff's RWAD complaint. (D.I. 54 at 18–20).

---

[4] The retaliation claim in the second amended complaint seems to be about workplace harassment, not termination. (D.I. 16 at 11–14). The briefing, by both sides, is about termination.

I agree with Defendant.

The RWAD complaint was filed April 6. Defendant was terminated six months later, on October 6. The gap in time is not suggestive of a causal relationship. *See LeBoon v. Lancaster Jewish Community Center Ass'n*, 503 F.3d 217, 233 (3d Cir. 2007) (stating that "[a]lthough there is no bright line rule as to what constitutes unduly suggestive temporal proximity, a gap of three months between the protected activity and the adverse action, without more, cannot create an inference of causation and defeat summary judgment"); *Daniels v. School Dist. of Philadelphia*, 776 F.3d 181, 198 (3d Cir. 2015) (finding no causal connection between a schoolteacher's protected activities and the school district's adverse employment action toward her where ten months passed between the schoolteacher's protected activities and the adverse employment action).

Plaintiff argues that the timing of an April 13, 2022 meeting between Plaintiff and Cressler, relative to Plaintiff's April 6, 2022 filing of the RWAD complaint, suggests that the meeting was in response to the RWAD complaint. (D.I. 55 at 18–19). There is no evidence to support that suggestion. Cressler, in an email, referred to the April 13, 2022 meeting as a one-on-one session during which Cressler and Plaintiff reviewed "current work priorities." (D.I. 54-3 at 37 of 154). Cressler did not describe the meeting as being related to the RWAD complaint or even mention the complaint at all. Plaintiff cites no deposition testimony from herself stating that the RWAD complaint was at all discussed or mentioned in the meeting.

Further, Cressler stated that she did not know about the RWAD complaint. (D.I. 54-1 at 125 of 308 (deposition transcript at 78:12–16)). As a result, her behavior could not have been a response to the complaint. Plaintiff contends that Cressler must have known about the complaint because Corbett interviewed Cressler as part of the RWAD investigation. (D.I. 55 at 23).

However, even though Corbett interviewed Cressler, there is no evidence that Corbett told Cressler that the interview took place because Plaintiff filed an RWAD complaint against Cressler. (*See* D.I. 54-4 at 8–17 of 264). Thus, there is no evidence of a "causal connection" between Plaintiff's RWAD complaint and Defendant's termination of Plaintiff. *Boandl*, 752 F.Supp.2d at 561. Plaintiff again argues that the lack of documentation related to her work performance and the absence of a PIP show that there is no legitimate, nondiscriminatory reason for her termination. D.I. 55 at 19–20). But, as discussed above, there was documentation of Plaintiff's substandard work performance before her termination, and a PIP was not necessary for Defendant to lawfully terminate Plaintiff. *See supra* III.A.

Thus, viewing the evidence in the light most favorable to Plaintiff, there is not sufficient evidence from which a jury find a "causal connection" between Plaintiff's requests for ADA accommodations and RWAD complaint against Cressler and Defendant's termination of Plaintiff's employment. *Boandl*, 752 F.Supp.2d at 561. Thus, Defendant is entitled to judgment as a matter of law on the retaliation claim.

## IV. CONCLUSION

For the foregoing reasons, Defendant's motion for summary judgment is GRANTED.

An appropriate order will issue.